Argued August 21, affirmed September 28, petition for rehearing denied October 25, 1973, petition for review pending

# MILLERSBURG DEVELOPMENT CORPORATION ET AL (No. 41427), *Appellants, v.* MULLEN ET AL, *Respondents.*

514 P2d 367

*James H. Jordan* and *Peter L. Powers*, Albany, argued the cause for appellants. On the brief were Weatherford, Thompson, Horton & Jordan, P.C., Albany.

*Jackson L. Frost*, District Attorney, Albany, argued the cause and filed the brief for respondents.

Before LANGTRY, Presiding Judge, and FOLEY and FORT, Judges.

LANGTRY, J.

This is a writ of review proceeding in which the circuit court upheld action of the Board of County Commissioners of Linn County in enlarging the area of a city proposed in a city incorporation election petition. It is contended that the county commissioners acted erroneously and arbitrarily in thus enlarging the proposed boundaries and that they exceeded their jurisdiction in this regard. These issues raise the question, when a county court or commission is deciding boundaries for a proposed "new city" election, is it acting in judicial or legislative capacity?

Petitions for a city incorporation election were filed with the Linn County clerk in March 1972, proposing the incorporation of an area designated therein as Millersburg, lying northerly of the city boundaries of Albany which has a population of 19,300 according to the 1973-74 Oregon Blue Book. The census taken in the area showed that 170 persons resided there. The petitions were signed by 102 persons, of whom 48 were registered voters. The map accompanying the petition shows the proposed area of the city to be contiguous to the Albany city limits on the southeasterly side. From that point it is spread out generally along Interstate 5 highway, between the highway and the Southern Pacific railroad right of way, and immediately to the west of the Southern Pacific right of way. The area shown on the map appears to be eight or nine times longer than its average width. It is described by a detailed metes and bounds description in the petition which does not indicate its total acreage. At

the hearings before the county commissioners it was repeatedly stated that there were 75.6 acres in it; in the briefs on appeal and in other documents it is described as containing 160 acres; and in the petition for writ of review it is stated that there are 182 acres in it.

After the hearings were completed, the commissioners had added to it so that there was a total of some 2,320 acres in the area to be referred to the electors therein for a vote on the proposition of incorporation. The property which was added to that originally proposed lies mostly in a fan shape northerly of the north end of the area originally proposed, but one added tract moves the proposed boundary westerly to include substantial frontage on the Willamette River. Several large industries are located in the added area, as well as agricultural land, a school, and more property used for residences. During the hearings before the commissioners Mr. Blunk, who is an officer of Millersburg Development Company and Teledyne Wah Chang, apparently sister corporations, stated that those corporations own a total of about 100 acres in the general area. It is not clear how much of this 100 acres was included in the original incorporation description but Mr. Blunk said it looked like about one-half of the land in that area belonged to them. The major part of the $17 million assessed value of the original area is in the industrial plant of the Teledyne Wah Chang metals corporation. That corporation was an active promoter of the original area proposed for incorporation and actively opposed the expanded boundaries. Some of the comments at the hearings indicated overtones to the effect that Wah Chang was fearful of being annexed to the city of Albany and was seeking the incorporation as a block thereto.

The contentions that the county commissioners acted erroneously and arbitrarily and that they exceeded their jurisdiction are so intertwined that we will discuss them as one. The procedure for the incorporation of new cities is found in ORS 221.010 through 221.100. These statutes provide that unincorporated areas in which at least 150 persons reside may incorporate by approving thereof in an election after petitions have been presented to and acted upon by the board of county commissioners of the county where the land lies. At least 20 per cent of the voters in the area must sign the petitions, which concededly occurred here. A 1965 amendment to the law, Oregon Laws 1965, ch 579 (the "urbanization" amendments), provides that, where any of the area proposed to be incorporated lies within an urbanized area (an area where all territory, among other things, is within six miles of a city having a population of 5,000 or more), there must be a resolution of the proximity city approving the incorporation or the petitions must be signed by at least one-half of the landowners who must themselves own one-half of the area of land and at least one-half of the assessed value of the real property in the area. The latter provision was met by the petitions in the case at bar. The city of Albany informed the county commissioners that it opposes the incorporation.

For purposes of our determination ORS 221.040 is the most important part of the incorporation Act. It provides in subsection (2) that

"* * * [t]he court [the county commission] may alter the boundaries as set forth in the petition to include all territory which may be benefited by being included within the boundaries of the proposed incorporated city, but shall not modify

boundaries so as to exclude any land which would be benefited by the formation of the proposed city. No land shall be included in the proposed city which will not, in the judgment of the court, be benefited * * * ."

We perceive three provisos concerning the action of the board of county commissioners in this statute. First, the commissioners *may* alter proposed boundaries to include *all* territory which *may be* benefited. Second, they *shall not* modify boundaries to exclude land which *would be* benefited. Third, they *shall not* include land which, in the judgment of the commissioners, *will not* be benefited. At the hearings where the Board of County Commissioners was exercising the judgment thus enjoined upon it, it heard comment from Mr. Hector MacPherson in which he said:

"* * * I request that the boundaries of the proposed city be extended out to include not only the old Millersburg School but out as far as the Morning Star Grange Hall, which happens to include my property. I think there would be substantial benefit to my property to have Wah Chang build me a sewer from their plant out to this property then I could develop this property * * *.

"* * * * *

"* * * [T]here will probably be a septic tank problem without sewers in this area. Sometime in the not too distant future."

The final boundaries selected by the commissioners went almost to, but did not include, Mr. MacPherson's property. Mr. Schmidt, a farmer whose property was in the area that was added to the north, testified:

"* * * I don't favor proliferation of municipalities in the area, that these folks want to organize in the proposed area that they do so, but not extend to the Millersburg community."

Mr. Schmidt did not believe that incorporation would benefit his property. Mr. Jordan, attorney for Wah Chang, stated:

"* * * [W]e don't feel * * * we could adequately serve the people in that area [beyond that in the original proposal] with sewer, fire, and so forth. They are a long ways away from the center that we are proposing in this petition. But we do not think that even if Wah Chang built the sewer, Mr. McPherson [sic], that that property would really be substantially benefited by being included at this time. They can always come in later * * *."

Other statements by the attorneys for petitioners detailed the benefits that would accrue to the property in the original petition, and the lack of benefits to the additional area. In numbers, more people who spoke at the hearings opposed expansion of boundaries than favored it, and substantial numbers of residents in the added area filed a remonstrance against being included. Mr. Rober, county planning director, testified:

"MR. BLUNK: Can I ask Mr. Rober [county planning director] a question?

"CHAIRMAN MULLEN: Yes.

"MR. BLUNK: This is aside from your testimony but speaking to Senator MacPherson's future growth, what is the present county planning proposal or zoning for this 1350 acres north of the cemetery?

"MR. ROBER: That's an interesting question. It's for heavy industry. Industry and heavy industry. The farm land being discussed is being opened, and is shown on our comprehensive plan for industry or heavy industry.

"MR. BLUNK: But not residential also.

"MR. ROBER: Unless you hit Millersburg's records, it is residential. So the description of the area, being people concentrated here, and people concentrated there, would be industry rather than agricultural land."

After hearing the bulk of this testimony and comments Commissioner Richardson of the Board of County Commissioners stated:

"* * * [E]ither we have a new town here or we don't have one. It is that simple. If we do have a new town, I think it should be large enough to take care of all necessities. I think that one place needs river frontage to be able to put in a sewer pipe. They have to have water to supply intake and out so they have to have frontage on the river, and I think the City has to have a place to grow. It is pretty obvious it is going to have to stay on this side of the freeway * * *.

"* * * * *

"* * * If this were done, this whole island will be taken care of. The people up this way, in all probability, would have to use the Albany facilities from the sewage plant. This area here is not as long as some of your laterals are now, clear to Millersburg. Your laterals are a lot longer than that at this time. Albany has extended out a lot further than this is now, and it worked very efficiently and it has the equipment to do so. There should be no city there, it should go to Albany, or if there is going to be a city, I think it should be large enough to take in the necessary things like the river, the industrial area, the residential area, and the school. The idea I had was not quite like Mr. McPherson's [sic] proposal * * *."

There was much other expression of opinion and evidence but the excerpts quoted above demonstrate that the Board of County Commissioners heard conflicting opinion and evidence about what area could be bene-

fited from incorporation and exercised judgment with reference thereto.

In *McManus v. Skoko,* 255 Or 374, 467 P2d 426 (1970), it was held that county commissioners may not frustrate a petition for an incorporation election by finding that no property would be benefited by incorporation and refusing to order an election. This was because the statute (ORS 221.020) gives the right of an election when the requisites are fulfilled. The court determined that there is no evidence of a legislative intent to allow the commissioners to refuse to have an election. The court said, however:

> "It is apparent * * * that the legislative purpose was to give the county courts [commissions] control over the boundaries of the proposed city and to eliminate repeated elections * * *." 255 Or at 379.

The case at bar is the first of its kind under the current statute. The central question is whether the language quoted supra from ORS 221.040 (2) gives the commissioners authority to do what they did on the record presented here. Petitioners contend the commissioners have sought to accomplish the same result the Clackamas County commissioners tried in *McManus,* namely, frustrate the petition; only they contend in this case they added so many residents who were opposed to incorporation that they have assured the defeat of the proposal. Whether this is so or not, we must measure what was done against the commissioners' statutory authority.

Before we do that, we must determine the type of function the commissioners are performing when they set the boundaries. It is suggested by petitioners that it is judicial in nature, like that of local govern-

ment boards sitting in individual zoning matters. In *Fasano v. Washington Co. Comm.*, 264 Or 574, 580-81, 507 P2d 23 (1973), the court said:

"Ordinances laying down general policies without regard to a specific piece of property are usually an exercise of legislative authority, are subject to limited review, and may only be attacked upon constitutional grounds for an arbitrary abuse of authority. On the other hand, a determination whether the permissible use of a specific piece of property should be changed is usually an exercise of judicial authority and its propriety is subject to an altogether different test. An illustration of an exercise of legislative authority is the passage of the ordinance by the Washington County Commission in 1963 which provided for the formation of a planned residential classification to be located in or adjacent to any residential zone. An exercise of judicial authority is the county commissioners' determination in this particular matter to change the classification of A.G.S. Development Company's specific piece of property. The distinction is stated, as follows, in Comment, *Zoning Amendments—The Product of Judicial or Quasi-Judicial action,* 33 Ohio St L J 130 (1972):

" '* * * Basically, this test involves the determination of whether action produces a general rule or policy which is applicable to an open class of individuals, interest, or situations, or whether it entails the application of a general rule or policy to specific individuals, interests, or situations. If the former determination is satisfied, there is legislative action; if the latter determination is satisfied, the action is judicial.' 33 Ohio St L J at 137.

"We reject the proposition that judicial review of the county commissioners' determination to change the zoning of the particular property in question is limited to a determination whether the change was arbitrary and capricious."

Using the general principles thus enunciated, we conclude the action of the commissioners in the case at bar was legislative in character. Certainly, the determination of the boundaries of a city—a political subdivision of the state—transcends the individual interests of each parcel of property proposed to be located therein. It becomes a matter of general interest in the whole area—a matter of general policy.

The same conclusion is dictated by the words we have quoted supra from ORS 221.040 (2) and commented upon. The commissioners are enjoined by this statute to use their judgment, with reference to benefits, when altering or modifying the proposed boundaries. The words "alter" and "modify" must be construed in the context in which they are used, and that context contemplates change dictated by use of judgment. Petitioners argue strongly that the meaning of the word "alter" is such that the commissioners may only make limited alterations in the proposed boundaries. This construction of the term is refuted by the context in which it is used. The commissioners "*may* alter the boundaries as set forth in the petition to include *all* territory which may be benefited * * *." (Emphasis supplied.) If petitioners can cut a small part out of a large area that may benefit from city functions and make a small city of it, they can thus frustrate the long-term interests of the larger area. The legislature must have intended to prevent this by providing that county commissioners—the elected representatives of all the people in the county—use their legislative judgment in rearranging proposed boundaries so that "all" territory that may benefit, regardless of its relative size in comparison to the original proposal, be represented in the incorporation election.

We have examined the extensive minutes of

legislative hearings on what became Oregon Laws 1965, ch 579, the "urbanization" amendments to ORS 221.010 and 221.030. Nothing therein indicates an intent other than that the commissioners should exercise an independent legislative judgment under the guidelines of ORS 221.040 (2). *See* Minutes of Senate Committee on Local Government April 20, 1965, p 9 (HB 1271), April 22, 1965, p 13 (HB 1271).

The action is legislative in character. On a writ of review we can overturn the action taken only if it is arbitrary. It is not our concern whether other— perhaps wiser, perhaps not wiser—commissioners would have taken different action. At bar, in the quotations from the record which we have copied in this opinion it is demonstrated that there were rational reasons for the action taken. It was not arbitrary, and the commissioners acted within the guidelines and jurisdiction conferred by the incorporation statutes.

The trial court held that

"* * * (1) the Linn County Board of Commissioners were authorized by law to make the decision as to boundaries which was made, and (2) * * * the function of the County Commissioners in this type of case goes beyond the function of hearing officers in administrative proceedings, and (3) * * * this Court cannot substitute its judgment for that of the Commissioners who are responsible as elected officials for their decision when made within the limits of their lawful authority as in this case."

This decision appears to be correct in all particulars.

Affirmed.